The trial judge abused his legal discretion, under the facts of this case, in refusing to allow the defendant to withdraw his plea of guilty.
 DECIDED SEPTEMBER 19, 1945.
The plaintiff in error, Gordon L. Rowland, hereinafter called the defendant, was indicted at the October term of the superior court of Coffee County for assault with intent to murder Jack Young, a policeman of the City of Douglas, Georgia. He entered a plea of guilty and was sentenced to not less than ten nor more than ten years in the penitentiary. Thereafter and during the same term of court, he filed a motion to withdraw his plea of guilty, alleging that he was ready to go to trial immediately or give bail to appear for trial at some future time.
The State filed an answer, denying the material allegations of the motion. A hearing was had during the October term on the issues thus formed. The motion to withdraw the plea was denied. On this judgment the defendant assigns error. In order to get a clearer view of the case, we will set out somewhat in detail the *Page 794 
evidence of the defendant at the hearing on the motion, as well as the evidence of the State in rebuttal.
The defendant, thirty-six years of age, was injured when a child of ten, riding with his mother in a buggy, when the horse hitched thereto became frightened and ran away. The buggy was over turned and the defendant received a head injury. Since that time, on becoming excited, he loses consciousness and falls. These periods sometimes last three or four hours. He can not account for the alleged attack on Jack Young, in any way except that it occurred during such an interval of unconsciousness. At the time of the alleged assault with intent to murder, the defendant was sitting in front of a service station some sixty odd feet from the sidewalk in the City of Douglas, molesting no one and in no wise boisterous or disorderly. Some time before he had suffered one of the attacks to which he was subject, and had fallen to the floor. When the policeman approached him after the defendant had gotten up from the floor of the filling station and was sitting in a chair, the policeman stated in substance, "I want you," or words to that effect. The policeman took hold of the defendant and they both walked from the filling station toward the city jail. The operator of the filling station testified: that during the afternoon of the occurrence the defendant came to his station; that he did not pay any particular attention to the defendant, but went about the duties connected with the operation of the station; that shortly thereafter he noticed that the defendant was on the floor of the station near the door, and was "writhing as though in pain — there [were] noticeably muscular contortions. Since he was not in my way or the way of my customers and was creating no disturbance beyond a groaning noise, and believing that he was intoxicated, I gave him no attention and went about the work that was on hand at the time. Some moments later I noticed that he had gotten up from the floor and was sitting on a chair dazed or dozing. He was still not creating any disturbance and neither was he boisterous or disorderly in any manner. I still thought he had too much to drink and was about half asleep. Since he was not interfering with my business and was not creating any disturbance, I still did not molest him." It was about this time that the policeman, Jack Young, came across the street and arrested the defendant. The defendant got off the chair, and the defendant and the *Page 795 
policeman left, going in the direction of the city jail. The witness heard no other words uttered by either of them. There was no resistance on the part of the defendant as they walked away.
The father of the defendant testified as to the nature of the injury received by the defendant as a child when thrown from a buggy. Prior to that time the defendant had fainting or spasmodic spells or attacks. After the injury, such attacks became worse, more aggravated and more intense and more manifested at times by violent muscular contractions and sometimes by apparent unconsciousness not accompanied by muscular contortions. The defendant would seem to be in a trance or mental stupor and unconscious of what was taking place about him. The father gave the defendant medical treatments at frequent intervals, but, instead of improving, the defendant grew worse as he grew older and these attacks became more frequent and resulted from less intense or exciting circumstances. The father also testified that, since the defendant's return from the United States Army in May, 1943, the defendant's wife on instructions from the Army authorities has kept constantly on watch over him even when he was attempting to work, in order that she might be near him to render assistance if and when an attack occurred. Attacks did occur on several occasions before the alleged assault with intent to murder, when he was alleged to have shot the policeman. The ailment of the defendant is hereditary. Four of his uncles on his mother's side were similarly afflicted and one sister. The defendant's condition was noticeably worse and more aggravated and the spells occurred more frequently after the buggy accident, and as he grew older they grew more frequent. On the date the shooting occurred, the defendant's wife had reason to go to Waycross, Georgia, to attend to some business, and she requested the father and the brothers of his family to look out for him, which they did a portion of the time, but during the afternoon the defendant went away from the rooms with his brother, and it was while so away that he committed the act alleged. The mother of the defendant (wife of the witness) was similarly afflicted, and upon treatment would seem to improve, but finally died from a cerebral hemorrhage. A list of the physicians who had treated the defendant was given.
The uncle of the defendant corroborated the testimony of the defendant's father. Dr. T. H. Clark, a practicing physician and *Page 796 
surgeon of Douglas, Georgia, testified that, he had made a physical examination of the defendant, and had examined the certified clinical report of the A. A. F. Regional Hospital of the United States Army at Keesler Field, Mississippi, bearing date of November 30, 1944, covering a period of confinement of the defendant in that hospital from January 12, 1943, to May 26, 1943; that from examination the defendant was essentially a negative case; that, in the opinion of Dr. Clark and from the clinical report of Keesler Field Hospital, the defendant is an epileptic; and that it was possible that he has periods of unconsciousness known as epileptic aura, at which time he is not conscious and does not realize what he is doing.
The clinical certificate of hospitalization above referred to shows his diagnosis to be: "1. Epilepsy, ideopathic, akinetic, witnesses by medical personnel 2/13/43. 2. Sinusitis, maxillary, chronis, non-suppurative, right, moderate severe, cause unknown. Family and Personal History: Family History: Father, living, health very poor, constant cough, never worked (TBC?). Mother: died 46, sick for years after carriage accident. 1 brother with Pott's disease; 1 brother with skull fracture and mental complications. 1 sister undernourished. 2 sisters all right. Wife has asthma. Personal History: Has had spells where he would lose consciousness off and on since the age of 10. Was never able to hold a job. Spells become more frequent in hot weather, and has had heat stroke twice; ever since gets dizzy in the sun. Whenever he tries to read, words blur, `mind gets crazy,' headache develops and he has to rest for a few minutes. Was never able to study or memorize anything. Denies venereal history. History of Present Illness: 11 January, 7:00 patient returned to his barracks and lost consciousness. Was told by friends that he fell back `limber as a dish rag' and was unconscious for three or four hours. Looked dead. Regained consciousness slowly in barracks. Subsequently was brought into the hospital. Claims to have bitten tongue, but there are not scars visible. Additional informationby barracks mates: Patient is described as being `highly nervous.' Had been worried about his ailing wife and on 11 January was thought to have been drinking in the afternoon. That night he `passed out' in a limp fashion. Cold water was thrown on his face but failed to *Page 797 
bring patient to consciousness so ambulance was called." The report also states: "Physical Examination, Essentially negative."
It appears from the defendant's affidavit that, after he left the filling station where the policeman arrested him, he and the policeman walked toward the city jail; a controversy arose between them, and at the time the policeman was shot the defendant lapsed into one of his states of unconsciousness and knew nothing of the shooting. The defendant further testified that, while he was in jail the sheriff, whom he thought to be friendly, stated that, if the defendant would plead guilty, he would receive a nominal sentence, probably with permission to serve the same on probation, whereas, on the other hand, if he should be tried and convicted, the result would be a sentence for a long number of years; that, because of the defendant's affliction, his mind and will were subordinated to the minds and wills of the sheriff and other attaches of the court handling the case; and that he was not mentally capable of discerning the effect of his act when he signed the purported waiver and plea of guilty. The defendant further testified that, he had no counsel; that he was never asked if he desired counsel; that the indictment was not read to him; that he was never told and never knew that he was entitled to a trial before a jury; that he was never advised that the charge was assault with intent to murder; that he was never advised what the penalty for "shooting Jack Young" was; that the defendant did not know that he was entitled to a copy of the indictment and a list of the witnesses; that he was wholly ignorant of all these rights, was unaware of the effect of signing the waiver and plea of guilty, and was unadvised of its effect until the court pronounced the sentence. As to what happened on the date the plea was signed, the defendant further testified that, he was carried from the county jail to the courthouse on the morning of October 16, 1944, and was seated in the southwest corner of the courtroom to the right of the presiding judge; that he was in company with other prisoners; that he had been told prior to going into the courtroom that he was charged with "shooting Jack Young;" that he was never told before he went to the courtroom or after he got there what the offense was or that it was assault with intent to murder; that he had no means to employ counsel; and that, when he was asked by the solicitor-general what he wanted to do, he answered, in substance, *Page 798 
"I reckon I am guilty." Whereupon the solicitor-general prepared some writing, and the defendant was escorted to the table and directed to sign the same, whereupon the solicitor stated in substance "Your honor, in the case of Gordon Rowland, the plea has been entered." At this time the policeman made a statement to the court. Because of the bewildered mental state of the defendant, he did not recall the substance of that statement. Then the presiding judge inquired of the defendant if he had anything to say, and the defendant replied, "I do not know anything about it." Whereupon the judge orally pronounced sentence of not less than ten years nor more than ten years in the penitentiary.
The State introduced the following rebuttal testimony: The sheriff testified that about a week before court convened the defendant was confined in jail, and the witness had a conversation with him and told the defendant that he was charged with the offense of assault with intent to murder, and should get a lawyer to look after his case. The sheriff talked with the defendant twice, telling him that he was going to need a lawyer to look after his case, and that about all the defendant would say would be, that "he just didn't know who to get and wanted him to tell him who to get. I didn't want to do that. He never stated to me that he was not able to employ a lawyer." On cross-examination: "The defendant was brought to the county jail from the custody of the policeman of the city jail. The defendant was told that he was charged with `shooting Jack Young.' . . I think I told him he was charged with assault with intent to murder up there in the courthouse. That was after he had been brought in the courtroom for the purpose of trial. I told him that he was charged with assault with intent to murder. . . and that he would need a lawyer. I told him the penalty was from so many years to ten years. I told him I thought he might get offlight by going ahead and entering a plea. The fact is that he was given the maximum sentence, no less and no more." (Italics ours.) The sheriff further testified that he did not know that the defendant was an epileptic, but that he had heard that he was. The witness stated that he was familiar with two people who were subject to epileptic fits; that he was not in position to say that the defendant was a normal person, in possession of normal faculties at the time the defendant passed the door of the sheriff's office on the way from the city jail to the *Page 799 
county jail. He couldn't say if the defendant was a normal person when he was put in jail. The witness had been sheriff for sixteen years. He testified that the defendant had been in his custody for several months, and he could not say as to whether the defendant while so confined had epileptic attacks, but that those having custody of the defendant had several times procured medical attention for the defendant. The witness further testified: "I told him that he was charged with assault with intent to murder. I told him what the penalty was. I don't remember where it starts at, but I said, `It is from so much to ten years.' The statement was made to him after he got up there in the courthouse. The defendant was seated over in the corner of the courtroom on the right-hand side of the judge and was presented with a paper that he signed and the solicitor-general said: `Your honor, the plea has been entered,' and then Mr. Jack Young made a statement at the request of the court. Then Mr. Rowland was asked if he had anything to say, and his reply was, `I don't know anything about it,' and then the court said to him, `It is not your fault you didn't kill him.' Then the court sentenced the defendant to serve not less than ten years nor more than ten years in the penitentiary. . . Before he entered a pleaI told him it would be the best for him to go ahead and enter aplea." (Italics ours.) Redirect: "I did not promise him anything when I told him that. I didn't convey to him that he would get a lighter sentence if he would plead. I never discussed the matter with either the judge or the solicitor as to what I told him about entering a plea."
We do not deem it necessary to set forth the evidence in the presentment as to the time and place of the alleged attack. It is in sharp conflict, and upon a trial the jury would be authorized to return a verdict of either acquittal or guilty. That is not the question before us. The only question is whether the trial judge abused his legal discretion in denying the motion to withdraw the plea of guilty after sentence had been pronounced. It is true, as contended by the State, that a plea of guilty stands upon the same footing as a conviction of guilty by a jury. Cummings v. Perry, 194 Ga. 424 (21 S.E.2d 847);Jackson v. Lowry, 171 Ga. 349 (155 S.E. 466). A plea of guilty is a conviction *Page 800 
of the highest order and waives all defenses other than that the indictment charges no crime. 14 Am. Jur. 952, § 272. We do not think that the facts of this case are controlled by Baughn v.State, 100 Ga. 554 (28 S.E. 68, 38 L.R.A. 577). It is also conceded that the judge has a right to believe the statement of the sheriff, and in so doing would not abuse his discretion. Likewise, it is not error to fail to furnish the accused with a copy of the indictment and a list of the witnesses, in the absence of a demand. Fears v. State, 125 Ga. 739 (3). It is not reversible error for the court to fail to appoint counsel for an accused, in the absence of a request therefor. Gatlin v.State, 17 Ga. App. 406 (87 S.E. 151). See also Clark v.Cobb, 195 Ga. 633, 640 (24 S.E.2d 782); McGhee v.State, 71 Ga. App. 52 (30 S.E.2d 54). While the principles thus cited by the State are included in the circumstances concerning the defendant in the instant case, they are urged by the defendant merely as incidents cumulative of the many other circumstances and incidents appearing in the record. To state it differently, the existence of a good many circumstances serve to magnify and reflect on other facts and circumstances in favor of the position of the accused. The abuse of sound legal discretion is not a reproach on the trial judge and does not imply a bad motive. It simply means a discretion that is clearly against the logic and effect of the facts which are urged against such judgment. It is well settled that a motion to withdraw a plea of guilty after sentence is pronounced is within the sound legal discretion of the court, and its judgment should never be reversed unless abused as a matter of law. In Farley v.State, 23 Ga. App. 151 (97 S.E. 870), this court held in effect that, where it appears that the plea was entered under a misapprehension as to the offense to which the defendant was pleading guilty, a refusal to grant a motion to withdraw the plea is an abuse of discretion. Perhaps the most learned decision, and the best reasoning we have read anywhere on the subject as to abuse of discretion in refusing to permit a withdrawal of plea of guilty after sentence will be found in the opinion in Griffin
v. State, 12 Ga. App. 615 (6) (77 S.E. 1080), which reads: "A plea of guilty is but a confession of guilt in open court, and a waiver of trial. Like a confession out of court, it ought to be scanned with care and received with caution. The judge is not bound to receive such a plea at all, and *Page 801 
in capital cases frequently declines to do so. Indeed, Blackstone says that in this class of cases the court ought generally to advise the prisoner to retract his plea and plead to the indictment. 4 Bl. Com. 329. A plea of guilty ought never to be received unless it is freely and voluntarily made; and, if the prisoner be misled or be induced to enter his plea by fraud, or even by mistake, he ought to be allowed to withdraw the plea. The law favors a trial on the merits. Gauldin v. Crawford,30 Ga. 674 (5). It does not encourage confessions of guilt, either in or out of court. Affirmative action on the part of the prisoner is required before he will be held to have waived the right of trial, created for his benefit. If he refuses to plead, the court pleads not guilty for him, and he is put upon his trial. The affirmative plea of guilty is received because the prisoner is willing, voluntarily, without inducement of any sort, to confess his guilt and expiate his offense. In some States statutes have been enacted requiring the judge to admonish the prisoner of the consequences before receiving his plea; and it is good practice and in the interest of fairness to do this, even though there is no statute requiring it. There are many cases in the books, and in none of them has the right to withdraw the plea been denied, where it was shown that it was not entered freely and voluntarily and with a full understanding of the consequences which might follow. It has been said that withdrawal of the plea should be allowed whenever interposed on account of `the flattery of hope or the torture of fear, or inadvertence or mistake,' or `in any case where justice requires it.' 2 Enc. P. P. 777. See, also, Id. 780-792. In 12 Cyc. 353, the rule is thus stated: "To authorize the acceptance and entry of a plea of guilty and judgment and sentence thereon, the plea must be entirely voluntary. It must not be induced by fear, or by misrepresentation, persuasion, or the holding out of false hopes, nor made through inadvertence or ignorance.' In Krolage v.
People, 224 Ill. 456 (79 N.E. 570, 8 Ann. Cas. 253), the rule is thus stated: "The withdrawal of a plea of guilty should not be denied in any criminal prosecution, where it is evident that the ends of justice will be subserved by permitting the substitution of the plea of not guilty. The defendant in a criminal prosecution should be permitted to withdraw his plea of guilty when unadvisedly given, where any reasonable ground is offered for going to the jury; and while this is a matter within the *Page 802 
discretion of the court, the discretion is a judicial one which should always be exercised in favor of innocence and liberty.' In State v. Stephens, 71 Mo. 535, the accused were induced to enter a plea of guilty under the belief that the punishment would be less than the maximum, this belief being induced by the representations of their own counsel, made after a conference with the judge. It was held, in substance, that the court erred in refusing to allow the pleas to be withdrawn, without reference to whether the judge himself did anything to mislead the accused or their counsel. Among other things the reviewing court said: `Courts have always been accustomed to exercise a great degree of care in receiving pleas of guilty, in prosecutions for felonies, to see that the prisoner has not made his plea by being misled, or under misapprehension or the like.'" It will thus be seen that a plea of guilty is but a confession in open court. Its voluntariness must be guarded with the same degree of carefulness in its reception as a confession out of court. If the reason of the plea of guilty is influenced by the slightest hope of benefit or the remotes fear of injury, it should not be allowed to stand. This does not necessarily mean that the court or the prosecuting officer must have knowledge of any hope of benefit which induced the defendant to enter the plea. It is sufficient if the plea is entered under a misapprehension or a mistake, or the defendant is led to believe, by anyone upon whom he has a right to rely, that he would benefit by entering the plea rather than by submitting his case to a jury. It will be observed that nowhere in this record, except in signing the plea, did the defendant ever confess that he intentionally shot Jack Young. A confession must be plenary. To the contrary, everywhere he speaks in the record he denies it. To those who have had experience in judicial administration, it must appear passing strange that, during the defendant's time in jail before his trial, in his several conversations with the sheriff, he never confessed or admitted that he intentionally shot Jack Young. We find the sheriff telling the defendant that the defendant shot Jack Young and would need a lawyer, and that the sentence could be ten years. Generally, the sheriff of a county is held in the very highest esteem. The people, generally, and defendants, particularly, with whom he comes in contact while in his custody, have the utmost respect for him. They confide in him. They generally regard him as their protector *Page 803 
and their intermediary, operating between them in their unfortunate predicaments and the machinery of the court. The defendants know him better than they do the presiding judge or the prosecuting officer, for oftentimes such other officers are strangers to the defendants — not so with the sheriff. From time immemorial the sheriff has been considered more than a mere arresting or peace officer; he is in a larger sense the protector of the people; and sheriffs are generally men of highest character, and are moved because of their responsibility to intercede in behalf of the unfortunate who are accused of crime. We say this because we are thoroughly convinced that in what the sheriff did and said in the instant case he was motivated by what he was convinced was the best course for the defendant to pursue. Hence we find him telling the defendant in the jail before court convened that the defendant was charged with shooting Jack Young and would need a lawyer. The defendant requested the sheriff to name a lawyer, but, for reasons honorable to the convictions of the sheriff, he would not do so. But we do find the sheriff at this instance stating, "I told him I thought he might get off light by going ahead and entering a plea." In this connection, the defendant testified that the sheriff told him that he would get a light sentence and probably serve it on probation. This is not all the sheriff told him. After court convened and on the day set for trial, we find the defendant sitting in a corner with other criminals. When his case was called, we find the sheriff telling him, "before he entered a plea, . . it would be the best for him to go ahead and enter a plea." The defendant immediately entered his plea. Did he expect a benefit from his conversation with the sheriff? He made no admission or confession out of court. In a short time thereafter and before the maximum sentence was imposed, the trial judge inquired of the defendant if he had anything to say, and his reply was, "I don't know anything about it."
Of course, this record reveals that neither the trial judge nor the solicitor-general knew what prompted the defendant to enter his plea; they then thought that he was entering it from a sense of guilt. The sheriff no doubt in good faith thought that, under the circumstances as he knew them, the defendant would receive a light sentence and probably have the privilege of serving it on probation, and there can not, under this record, be imputed to the *Page 804 
court or any of its attaches any bad faith in the transaction. That is not the point. The question is, did the defendant enter the plea freely and voluntarily, without any hope of benefit? Under all the facts and circumstances of this case, we are constrained to hold that he did not, and that the distinguished judge abused his discretion in denying the motion to withdraw the plea of guilty. The mental and physical condition of the defendant as revealed by this record confirms us in the conviction that a reversal of this case is right and just, and demanded.
Judgment reversed. Broyles, C. J., and MacIntyre, J.,concur.